IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA, | |
|---|---|
| v. | Criminal No. 21-CR-10120-WGY |
| SONGFENG CHEN | |

**Government's Opposition to Defendant's Motion To Sever**

The United States of America, by and through its counsel of record, Rachael S. Rollins, United States Attorney for the District of Massachusetts, and Leah B. Foley, Assistant United States Attorney, hereby opposes the Motion to Sever filed by Songfeng Chen [Dkt. No. 102].

Defendant fails to show that the charges in the indictment were improperly joined or that he will suffer unfair prejudice if tried with his co-defendants. Accordingly, the Defendant's Motion should be denied.

**Factual Background**[1]

In October 2019, the Boston Drug Enforcement Administration ("DEA") began investigating a Sinaloa, Mexico-based drug trafficking organization (the "Sinaloa DTO") after the Sinaloa DTO delivered 17 kilograms of fentanyl and 23 kilograms of cocaine to Massachusetts, which were seized by investigators. The investigation identified a number of drug cells that the Sinaloa DTO was supplying with fentanyl and cocaine, which was then being

---

[1] The facts in this section are taken from sworn affidavits submitted in support of the criminal complaint in which defendant was initially charged in this matter [Dkt. No. 21-6200-MPK] and a search warrant for a safe deposit box held in the defendant's name [Dkt. No. 21-6218-MPK], and law enforcement reports produced to the defendant in discovery.

distributed throughout the United States. Cesar CASTRO Pujols was the leader of a Massachusetts-based cell that distributed drugs to and collected drug proceeds from other drug traffickers who were supplied by the Sinaloa DTO or other cells. As a cell leader, CASTRO and his associates collected money from drug customers and turned the proceeds over to individuals who would launder the money and repatriate it back to Mexico and the Dominican Republic.

During the course of the investigation, investigators obtained judicial authorization to intercept communications over phones used by various targets, including CASTRO. The interceptions began in March 2020 and terminated in March 2021. The details provided in the intercepted calls allowed investigators to surveil arranged drug transactions, which resulted in drug seizures from CASTRO's associates (including co-defendant HERAUX) and customers (including co-defendant GUERRERO), and seizures of drug proceeds, including from the defendant and HERAUX. The intercepted calls further allowed investigators to identify a number of individuals who were laundering drug proceeds for the DTO, including the defendant and co-defendant YING.

On November 4, 2020, investigators intercepted a series of text messages between CASTRO and the defendant. At the beginning of the call, CASTRO and the defendant exchanged a code word ("Tom") and the serial number for a dollar bill ("F17059940L") and arranged to meet to exchange money at a location in Quincy, Massachusetts.

| | |
|---|---|
| CASTRO | Hello |
| *DEFENDANT* | *Hi* |
| CASTRO | Tom . . . F17059940L . . . For when they are available |
| *DEFENDANT* | *Yes . . . I'm sorry, I am not available to pick up phone call now* |
| CASTRO | Ok sorry . . . They told me to mark you |

2

| | | |
|---|---|---|
| *DEFENDANT* | | *Do u want to meet tomorrow morning?* |
| CASTRO | | Ok |
| *DEFENDANT* | | *Yes, I told them u have contacted me* |
| CASTRO | | Ok |
| *DEFENDANT* | | *Are they available tomorrow?* |
| CASTRO | | Yes |
| *DEFENDANT* | | *Meet tomorrow 9 Am 219 Quincy Ave, Quincy MA 02169* |
| CASTRO | | Hi hey I'm going to send you the address |
| *DEFENDANT* | | *Wait, let me ask them* |
| CASTRO | | Ok |
| *DEFENDANT* | | *Hey, we usually don't go out. Could you come?* |

On November 5, 2020, CASTRO and the defendant resumed their text messaging exchanges to coordinate a time and location for their meeting.

| | | |
|---|---|---|
| CASTRO | | Hello good afternoon are available for today |
| *DEFENDANT* | | *Hi, Yes, I have time between 5:30 to 6:30. Are u coming over?* |
| CASTRO | | Ok good. Between |
| *DEFENDANT* | | *If you're gonna come over, I'm going to send you a new meeting place, also it will be in Quincy* |
| CASTRO | | I will be there before 6:30pm |
| *DEFENDANT* | | *Great, let me know when you are going to come here. I send you a new address. It will around North Quincy. Sorry, because I am not sure when I would be at that time* |
| CASTRO | | Ok |

3

At 5:18 p.m., CASTRO sent a text saying that his courier was arriving ("Hello in 8 minutes the girl is there."). After this text message, CASTRO called the defendant to further coordinate. The defendant asked if CASTRO had sent a courier. The defendant told CASTRO he would send a new address for the meeting ("Okay, I'm sending you a message too, okay?'). after additional exchanges, the defendant texted an address to CASTRO ("477 Hancock St, Quincy, MA 02171") and then sent a text telling CASTRO that his associate was at the location ("My friend here."). CASTRO then asked via text message what country the defendant was from so he could identify the associate sent by the defendant ("What country are you from to slip the girl?"), and the defendant replied by text that he was from China ("China man.").

After several more text messages and a phone call back and forth trying to locate each other, the defendant told CASTRO he was sending him a new address to meet ("118 Holmes street."). A few minutes later, the defendant sent a text to CASTRO with the original meet location ("477 Hancock St, Quincy, MA 02171"). After this last text, CASTRO called the defendant asking if he was outside smoking ("You smoking? Do you smoking?"). The defendant affirmed and CASTRO was heard saying to someone, "Yes, that's him." The defendant asked if the person who was approaching him was CASTRO's associate ("Okay. Is that you?"), and CASTRO affirmed ("Yes, yes. Okay, my friend.").

Based on the text exchanges and calls, investigators established surveillance in the area of 477 Hancock Street and 800 Hyde Park Avenue, which was a location used by CASTRO and HERAUX to store drugs. At approximately 4:00 p.m., CASTRO and HERAUX left 800 Hyde Park Avenue. At 5:00 p.m., co-defendant CARMONA, one of CASTRO's couriers, left 800 Hyde Park and traveled to Quincy. CARMONA parked his car about a block away from 477 Hancock Street. At 5:50 p.m., CARMONA got out of his car carrying a white bag and walked

4

toward Hancock Street. CARMONA got into the rear passenger seat of an Audi sedan (the "Audi") with the bag. After approximately one minute, CARMONA got out of the Audi without the bag and walked back in the direction of his car.

At 5:55 p.m., the Audi left the area. At 5:59 p.m., at the direction of investigators, a Quincy police officer conducted a motor vehicle stop of the Audi. The driver was identified by his Massachusetts driver's license as Yufeng Chen and the passenger was identified as Songfeng Chen, the defendant. Inside of the Audi, the officer saw in plain view the white bag, which was at the feet of the defendant. The bag was seized and found to contain $100,020. The defendant claimed the money was being used to start a business. After the money was seized, the defendant went to the Quincy Police Department attempting to recover the money. The defendant gave the officer his phone number (which was the number he had used to coordinate the money drop with CASTRO) and his Quincy address. The defendant claimed that he was starting a business and the money had been given to him by friends. When asked, the defendant declined to give the names of the friends. He left the station and did not inquire again about the money.

On March 23, 2021, the defendant and six others were arrested pursuant to a criminal complaint, which charged the defendant and six other co-defendants with conspiracy to launder money, in violation of 18 U.S.C. §1956(h). That same day, investigators executed a dozen search warrants, including at the defendant's residence and on a safety deposit box held in his name. During the search of defendant's residence, investigators recovered evidence of a money laundering operation. Among the items recovered were the following: three cell phones, one of which was the same phone that the defendant had used to communicate with CASTRO;[2] keys to

---

[2] The defendant was concealing this phone in his underwear at the time of his arrest.

a safe deposit box, which contained approximately $4,000; a laptop computer and tablet, and three computer hard drives. Alongside these objects, investigators found numerous notes that contained financial account information. One note contained a password for a financial account. A second note contained the account numbers for six bank accounts, with corresponding Chinese characters. There were also notes with various phone numbers, account numbers and passwords. Finally, investigators seized debit cards for a TD Bank account and a Bank of America account, as well as four UnionPay debit cards that were issued by three different Chinese banks.

During searches of the residences and stash locations of other co-defendants, investigators seized over 10 kilograms of fentanyl and $315,000 in United States currency.

On April 15, 2021, a grand jury returned an indictment charging the defendant, Cesar Alejandro CASTRO Pujols, Andre HERAUX Martinez, Fermin CASTILLO, Kevin CARMONA Victorino, Saturnino GUERRERO, and Chi YING with conspiracy to launder money. The same indictment charged CASTRO, HERAUX, CASTILLO, CARMONA, GUERRERO, and Kevin HAYES with conspiracy to distribute 400 grams or more of fentanyl and cocaine, in violation of 21 U.S.C. § 846.

**Legal Standards**

There is a default presumption in favor of joining co-defendants. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see* FED. R. CRIM. P. 8(b) (allowing for the joinder of co-defendants "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses"). Joint trials of co-defendants are the default, because "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537; *Richardson v. Marsh*, 481 U.S. 200,

210 (1987) ("It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings . . . .").

Accordingly, "[t]he general rule in the First Circuit 'is that *those indicted together are tried together* to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources.'" *United States v. Rose*, 914 F.Supp.2d 15, 35 (D. Mass. 2012) (emphasis added) (quoting *United States v. Soto–Beniquez*, 356 F.3d 1, 29 (1st Cir. 2004)). Moreover, the preference for joint trials is "particularly strong" where the charges include conspiracy. *Rose*, 914 F.Supp.2d at 35 (citing *United States v. Tejeda*, 481 F.3d 44, 54 (1st Cir. 2007) ("This rule has particular resonance in drug conspiracy cases, where multiple defendants often share a single indictment.")); *United States v. Deluca*, 137 F.3d 24, 36 (1st Cir. 1998) ("In the context of conspiracy, severance will rarely, if ever, be required") (citation and internal formatting omitted); *see also Kansas v. Carr*, 577 U.S. 108, 125 (2016) ("Joint proceedings are not only permissible but are often preferable when the joined defendants' criminal conduct arises out of a single chain of events.").

Although Federal Rule of Criminal Procedure Rule 14(a) allows for the severance of co-defendants, established caselaw requires the defense to carry a heavy burden. *Zafiro*, 506 U.S. at 539 ("A district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."). To succeed on a severance motion, the First Circuit has held that the defense must demonstrate that there is a *strong showing of prejudice*. *United States v. Martinez*, 922 F.2d 914, 922 (1st Cir. 1991); *Tejada*, 481 F.3d at 55 ("Severance should be granted where 'defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts.'") (citation omitted); *United States v. DeLeon*, 187 F.3d

60, 63 (1st Cir. 1999) ("To overcome the district court's presumption in favor of joinder, [a defendant] must demonstrate prejudice so pervasive that it would be likely to effect a miscarriage of justice.").

A common argument favoring severance is concern over "spillover," *i.e.*, "where evidence that is not admissible or should not be considered against one defendant on his or her own is admitted against a codefendant." *United States v. Rodriguez-Canchani*, No. 19-710 (FAB), 2021 WL 4768272, at *2 (D. P.R. Oct. 12, 2021) (citation and internal formatting omitted). The spillover argument "also refers to the threat that defendants charged with only a minor role will be assessed according to the extensive evidence against other defendants." *Id*. (citation and internal formatting omitted); *see also Tejada*, 481 F.3d at 56 ("This is a sort of argument that 'you are known by the friends you keep,' and bad friends will taint you in the jury's eyes.").

However, the spillover argument, while compelling in certain cases, is threadbare when applied to a conspiracy case. *See id*. ("[I]t is almost inherent in drug conspiracy cases that a co-conspirator may have engaged in other types of blameworthy conduct. That is not enough to warrant severance of co-defendants' trials."); *United States v. Celestin*, 612 F.3d 14, 19 (1st Cir. 2010) ("The hurdle is intentionally high, particularly in conspiracy cases, where severance is especially disfavored.") (citation and internal formatting omitted); *accord United States v. Morgan*, 748 F.3d 1024, 1044 (10th Cir. 2014).

Finally, if there is risk of spillover or any other potential unfair prejudice, courts have held that limiting instructions have a strong curative effect. *Zafiro*, 506 U.S. at 538 ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.") (citation omitted); *United States v. Figueroa*, 976 F.2d 1446, 1452 (1st Cir. 1992) ("[E]ven

assuming some evidentiary spillover, any prejudice was minimized by the limiting instructions given before and after the closing arguments.").

## Argument

**<u>Joinder is proper because the defendants were all part of one common act or transaction</u>**.

In the instant case, the Indictment charges six defendants (CASTRO, HERAUX, CASTILLO, CARMONA, GUERRERO, and HAYES) with conspiracy to distribute fentanyl and cocaine in Count One. Five of the six defendants charged in Count One are also charged in Count Two, along with the defendant and YING, with conspiracy to launder money. The Indictment further alleges that the financial transactions and attempted transactions used to affect the money laundering conspiracy involved proceeds from "the distribution of controlled substances." This common union to launder and attempt to launder funds garnered from a singular drug distribution conspiracy represents "the same act or transaction, or [] the same series of acts or transactions, constituting an offense or offenses[,]" sufficient to join all defendants together. *See* FED. R. CRIM. P. 8(b).

The long-term investigation that led to the Indictment produced substantial evidence of the symbiotic and overlapping relationships between the drug trafficking and money laundering defendants. The drug trafficking organization relied on the money launderers to operationalize their business: without the ability to launder drug proceeds covertly and repatriate the proceeds back to the drug suppliers, the organization fails to obtain drugs. By coordinating with CASTRO and conducting the money exchange with co-defendant CARMONA, the defendant inserted himself into the "same act or transaction" for which the defendants are charged.

As the intercepted communications make clear, the defendant was well versed in the coded language used by drug traffickers to arrange for money pickups and how they occurred.

9

He understood when CASTRO gave him the code word "Tom" and the serial number for a dollar bill that the call was to arrange a money pickup. CASTRO had clearly received the defendant's number from another money launderer or drug trafficker ("They told me to mark you."), and the defendant's response confirmed such ("Yes, I told them u have contacted me."). In another call, the defendant's use of the word "we" indicates that he was conspiring with others ("Hey, we usually don't go out. Could you come?"). During yet another call, the defendant told CASTRO that an associate of his had arrived at the meeting location ("My friend here.") to pick up the money. Finally, the financial account information seized from the defendant's residence at the time of his arrest and encrypted applications found on his phone indicate the defendant was engaged in money laundering.

Courts are near-uniform that, in a trial involving drug-related charges, a defendant charged with money-laundering should be tried jointly alongside his or her drug-trafficking co-conspirators. *See, e.g., United States v. Fernandez*, 559 F.3d 303, 317 (5th Cir. 2009) (holding that it was proper to refuse to sever the defendant's money-laundering trial from that of his co-defendants, on trial for more serious drug offenses and conspiracy to murder); *United States v. Kollman*, No. 1:10–CR–00044–R, 2011 WL 6016893, at *4 (W.D. Ky. Dec. 2, 2011) ("The interconnectedness of money laundering and drug dealing, along with the overlap of actors in these two conspiracies from the indictment, demonstrates [defendant's] request is untethered from the applicable facts and law."); *United States v. Bibbs*, No. 3:19-CR-151-TAV-DCP, 2021 WL 2383326, at *12 (E.D. Tenn. June 10, 2021) (refusing to sever the defendant's drug charges from co-defendants' money-laundering charges, reasoning that the "action involves the activities of an alleged drug trafficking organization, which included money laundering.") (internal formatting and citation omitted); *United States v. Johnson*, No. 11–cr–20752, 2013 WL 870374

at *2 (S.D. Mich. March 8, 2013) ("[E]vidence of drug trafficking will be presented in [defendant's] case, regardless if the Court were to grant her Motion to Sever, because narcotics distribution represents the 'unlawful activity,' under 18 U.S.C. § 1956(a), from which [defendant] allegedly laundered the proceeds.").

In a nearly identical factual scenario to the present case, the defendant in *United States v. Johnson* sought to sever her money laundering charges from the drug trafficking charges of 15 other defendants. *Id*. at *1. The defendant argued that severance was proper because there was "no logical interrelationship" with her co-defendant's drug trafficking charges, and also that there was a serious risk of spillover. *Id*. The court first noted that money laundering is *in fact* logically interrelated with drug trafficking, as it determines the overall success of a conspiracy to distribute drugs. *Id*. (citing *United States v. Rooks*, 181 F.3d 105, 1999 WL 357830, at *3–4 (6th Cir. May 25, 1999) ("We have determined that money-laundering is an act integrally related to the success of a conspiracy to distribute drugs.") (citation and internal formatting omitted)).

The *Johnson* court found that the money laundering and drug distribution conspiracies were intimately connected. Likewise, the court in *Johnson* quickly dispelled with the spillover contention, stating that evidence of drug trafficking would inevitably be introduced at her trial anyway. *Johnson*, 2013 WL 870374 at *2; *accord United States v. Cancel-Lorenzana*, 28 F.Supp.3d 138, 142 (D. P.R. 2014) ("Evidence of [a co-defendant's] extensive participation in separate drug-trafficking conspiracies for [which defendant] is not charged would nevertheless be admissible against her alone to show her knowledge of the [specified unlawful activity] connected to the charged money-laundering violations."); *United States v. Acosta*, No. 12–20157–CR, 2012 WL 3887534, at *4 (S.D. Fla. Sep. 7, 2012) ("To the contrary, the drug-trafficking and money-laundering counts are not only properly joined, but the public's interest in

11

the efficient and economic administration of justice weighs heavily in favor of a single trial."); *United States v. Rivera-Banchs*, 20-CR-6046-EAW-MJP-3, 2021 WL 5176669, at *7 (W.D.N.Y. Nov. 8, 2021) (agreeing with the theory "that the money laundering charge against Defendant was properly joined in the [drug conspiracy] Indictment as the proceeds that were laundered by Defendant and co-defendant . . . came from drug crimes for which [co-defendant] is charged.") (citation omitted).

The defendant's involvement with laundering drug proceeds was "integrally related to the success" of the charged drug conspiracy. Evidence of the drug trafficking charged in Count One is admissible to prove the money laundering conspiracy charged in Count Two. Accordingly, it is only proper to keep the counts and trials together.

### Severance is not warranted on the grounds of unfair prejudice, spillover, or over-complexity.

While severance is at times an available remedy where there is unfair prejudice, *see* FED. R. CRIM. P. 14(a), this case does not present one of those times. The defense presents nothing more than general warnings that joining his trial would present risks of unfair prejudice, yet it cannot point to truly particular risks of unfair prejudice. In *United States v. Fernandez*, the defendant appealed his money-laundering conviction on grounds similar to those defendant alleges may occur here: that the evidence presented against his co-defendants on their separate murder charges would unfairly prejudice his own defense. *Fernandez*, 559 F.3d at 317. Rejecting this claim, the Fifth Circuit reasoned that the defendant's involvement in the conspiracy overlapped with the murder conspiracy and drug distribution activities of his co-defendants, and that that he also knew his co-defendants. *Id*. Accordingly, it was proper to reject his severance motion, and to instead issue limiting instructions. *Id*.

Here, the evidence of the co-defendants' drug trafficking activities is admissible at the trial of the defendant because the government must prove that the funds involved in the transaction or attempted transaction were proceeds from drug trafficking. The defendant picked up over $100,000 in cash from a co-defendant charged in the same count. Evidence of the drug trafficking activities charged in Count One will explain how this $100,000 was obtained (selling kilogram quantities of drugs) and why the drug traffickers relied on the defendant to launder the money. That evidence is highly relevant; it is not unfairly prejudicial.

Likewise, the defendant's Motion treats the risk of spillover with the same generality as it does with the risk of unfair prejudice, yielding the same result against its favor. In *United States v. Cancel-Lorenzana*, the court denied the defendant's motion to sever her money laundering charges from her husband and his own drug trafficking conspiracy charges, holding that there was insufficient spillover prejudice to warrant severance. 28 F.Supp.3d at 142. Akin to the defendant's argument, the *Cancel-Lorenzanza* defendant contended that her husband's involvement in a separate drug trafficking conspiracy would be inadmissible against her if she were tried alone, thus rendering the evidence "prejudicial spillover." *Id*. at 141. Rejecting the defendant's arguments, the court found that the defendant's husband's drug trafficking conduct constituted a necessary element of the money laundering offense—the "specified unlawful activity". *Id*; s*ee also* 18 U.S.C. § 1956(a). Accordingly, the government could present evidence of drug-trafficking activities to form its case-in-chief against the defendant; the drug trafficking evidence would be admissible against her to prove *her knowledge* of the specified unlawful activity connected to *her money laundering charge*. "Where evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an

improper spillover effect." *Cancel-Lorenzana*, 28 F.Supp.3d 138 at 141 (quoting *United States v. O'Bryant*, 998 F.2d 21, 26 (1st Cir. 1993)).

Like the *Cancel-Lorenzana* defendant, the defense cannot prevail on its general claims of a spillover risk. As in *Cancel-Lorenzana*, evidence of the drug conspiracy is admissible to prove the source of the "specified unlawful activity." To prevail at trial, the government needs to prove that the defendant knew the funds were from an illicit source (specified unlawful activity), but it does not need to prove specifically that the defendant himself knew the funds were drug proceeds. The government must separately prove that the funds *were* from drug trafficking. For this reason, trying the defendant with his co-defendants makes sense, because the evidence he objects to will be independently admissible against him, even if the counts are severed. Moreover, provided that any evidence that was not admissible against him does happen to "spill over," the appropriate remedy would be the curative effect of the Court's limiting instructions. *See id*. at 142 (citing *United States v. Floyd*, 740 F.3d 22, 37 (1st Cir. 2014)).

Finally, the defenses' last argument—that the relative complexity of his co-defendants' case will harm his own interests—suffers the same fate as his primary arguments. It is well-established law that the complexity of the case, the defendant's relative lack of culpability, or the fact that the defendant's "sole" involvement in the conspiracy was merely to launder money does not warrant severance. *See, e.g., United States v. Soto-Beniquez*, 356 F.3d 1, 30 (1st Cir. 2003) ("As to the complexity of the case and the potential for jury confusion, there is no indication that the jury was unable to distinguish the evidence and acts relating to each defendant . . . [d]efendants are not entitled to severance solely on the basis that their co-defendants were more culpable.") (citation omitted); *United States v. Kaur*, 525 Fed.Appx. 143, 146 (3rd Cir. 2013) (explaining that it was not error to sever trials in a money-laundering case, where the

"Government was seeking to introduce a prejudicial tape-recorded conversation between her co-defendant and a third-party 'drug mastermind.'"); *United States v. Alvarez*, 561 Fed.Appx. 375, 384 (5th Cir. 2014) ("[Defendant] has not established that the evidence involved inflammatory facts or complex crimes that precluded the jury from being able to assess the evidence against each defendant separately and individually.") (citation omitted); *United States v. Ford*, No. 3:19-cr-00112-TMB-SAO-3, 2021 WL 5042985, at *6 (D. Alaska Oct. 29, 2021) (finding that joinder of co-defendants in drug conspiracy, money-laundering and murder case was proper, even when only one co-defendant was charged with murder).

## Conclusion

The default rule favors joinder of co-defendants and the law favors trying defendants charged in conspiracy counts together. This case presents no facts or arguments to point this Court in any direction contrary to that default. Accordingly, this Court should deny the defendant's Motion to Sever.

    Respectfully submitted,

    RACHAEL S. ROLLINS
    United States Attorney

By: */s/ Leah B. Foley*
    Leah B. Foley
    Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I, Leah B. Foley, Assistant U.S. Attorney, do hereby certify that on February 22, 2022, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

                                                      */s/ Leah B. Foley*
                                                      Leah B. Foley
                                                      Assistant U.S. Attorney